UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

CASE NO.: 1:19-cv-07772

PRISCILLA DOE,

          Plaintiff,

vs.

DARREN K. INDYKE AND
RICHARD D. KAHN AS JOINT
PERSONAL REPRESENTATIVES OF
THE ESTATE OF JEFFREY E. EPSTEIN,
NINE EAST 71ST STREET, CORPORATION,
FINANCIAL TRUST COMPANY, INC.,
NES, LLC, MAPLE, INC., LSJ, LLC,
HBRK ASSOCIATES, INC., JEGE, INC.,

          Defendants.
_____/

**FIRST AMENDED COMPLAINT**

    Plaintiff, PRISCILLA DOE, by and through her undersigned counsel, for her

claims against Defendants, alleges as follows:

    1.      This action is brought pursuant to 18 U.S.C. §1591 - §1595.  Therefore,

jurisdiction is proper under 28 U.S.C. §1331.

    2.      Plaintiff files this Complaint under a pseudonym in order to protect her

identity because this Complaint makes allegations of a sensitive sexual nature the

disclosure of which, in association with her name, would cause further harm to her.

1

3.      Plaintiff is currently a resident of and domiciled in the State of New York.

4.      At all times material, Jeffrey Epstein was a citizen of the United States and a resident of the U.S. Virgin Islands.  Jeffrey Epstein was a man of extraordinary wealth who travelled between and stayed regularly in multiple residences, including in New York, New York (within the Southern District of New York) at 9 East 71st Street, New York, NY 10021; in Palm Beach, Florida at 358 El Brillo Way, Palm Beach, Florida 33480; in New Mexico at 49 Zorro Ranch Road, Stanley, New Mexico 87056, and in the United States Virgin Islands at Island Little St. James Island No. 6B USVI 00802.

5.      At all times material to this cause of action Jeffrey Epstein was an adult male born in 1953, who died on August 10, 2019.

6.      Defendants Darren K. Indyke and Richard D. Kahn are sued in their capacity as Co- Executors of the Estate of Jeffrey E. Epstein ("Estate of Jeffrey E. Epstein"), which was opened and domiciled in the United States Virgin Islands, St. Thomas Division, and is the legal entity responsible for intentional, criminal, or tortious conduct committed by Jeffrey Epstein as described in this Complaint.

7.      At all times material hereto, Defendant, Financial Trust Company, Inc. ("Financial Trust"), was and is a U.S. Virgin Islands corporation conducting business in multiple locations including New York.

8.      At all times material hereto, Defendant NES, LLC, ("NES") was and is a domestic limited liability company registered in and conducting business in multiple locations including New York.

9.      At all times material hereto, Defendant HBRK Associates, Inc., ("HBRK") is and was a domestic business corporation registered in and conducting business in multiple locations including New York with a Registered Agent located at 1365 York Avenue, Apartment 28, New York, New York 10021.

10.      At all times material hereto, Defendant, The Florida Science Foundation, Inc., ("Florida Science") was a Florida Corporation with a principal place of business located at 250 Australian Avenue, Suite 1400, West Palm Beach, Florida 33401.   Employees of Florida Science conducted Florida Science business in New York and Florida.

11.      Corporate Defendants NES, LLC; Financial Trust Company, Inc; HBRK Associates, Inc.; and Florida Science, referred to as "Corporate Defendants," each performed business, in whole or part, in New York.

12.      Plaintiff reserves her right to amend this complaint to add or substitute additional parties if discovery reveals the identities of other tortious corporate or individual actors.

13.     A substantial part of the acts, events, and omissions giving rise to this cause of action occurred in the Southern District of New York; venue is proper in this District.  28 U.S.C. section 1391(b)(2).

14.     This action has been timely filed pursuant to N.Y. C.P.L.R. § 215(8)(a), which provides that a plaintiff shall have at least one year from the termination of a criminal action against the same defendant to commence an action with respect to the event or occurrence from which the criminal action arose. The Southern District of New York criminal action against Epstein with respect to the same sex trafficking enterprise from which Plaintiff's claims arise was terminated on August 29, 2019.

15.     Any statute of limitations applicable to Plaintiff's claims, if any, is tolled due to the continuous, over multiple years, active deception, duress, threats of retaliation, threats of physical harm including death threats, and other forms of misconduct that Epstein and the Corporate Defendants used to silence their many victims, including Plaintiff. Epstein's and Corporate Defendant's actions deprived Plaintiff of the opportunity to commence this lawsuit before his arrest for charges brought by the United States Attorney's Office for the Southern District of New York. Until then, Plaintiff feared that Epstein and his co-conspirators would harm her or her family, or ruin her life, if she came forward. Plaintiff filed her complaint within a month of Epstein's arrest for charges brought by the United States Attorney's Office for the Southern District of New York.

16.     Defendants are equitably estopped from asserting a statute of limitations defense. Allowing Defendants to do so would be unjust. Epstein and Corporate Defendants and their employees continuously intimidated each of his victims, including Plaintiff, into silence by threatening their lives and their livelihoods. They therefore prevented Plaintiff from commencing this lawsuit before his arrest for the sex trafficking scheme brought by the United States Attorney's Office for the Southern District of New York. By using threats, along with his wealth and power, Epstein and the Corporate Defendants were able to escape punishment for the intolerable and brutal crimes against countless young women and underage girls for the duration of Epstein's life.

## FACTUAL ALLEGATIONS

17.     Jeffrey Epstein, the leader of a complex commercial sex trafficking and abuse ring, was an officer, director, or employee of many corporate entities registered in various states throughout the United States, one or more of which may also be legally responsible for the crimes he committed against young females, including Plaintiff.

18.     Additionally, individuals who worked at the residences where sexual criminal acts were committed, or friends or acquaintances who assisted Jeffrey Epstein in committing such violations or those of his wealthy, famous, or socially powerful friends with whom Jeffrey Epstein caused Plaintiff to be sexually abused

by, or those who were employed through, or worked for, numerous other corporate entities, including Corporate Defendants, who caused or contributed to causing the sexual violations that caused harm to Plaintiff, may additionally be added as defendants.

19.     At all times material to this cause of action, Jeffrey Epstein (legally represented now through Darren K. Indyke and Richard D. Kahn as Co-Executors of the Estate of Jeffrey E. Epstein (and referred to herein as "Estate of Jeffrey E. Epstein") and Corporate Defendants owed a duty to Plaintiff to treat her in a non-negligent manner and not to commit, or conspire to commit, or cause to be committed intentional, criminal, fraudulent, or tortious acts against Plaintiff, including any acts that would cause Plaintiff to be harmed through conduct committed against her in violation of Common law battery, New York Penal Law section 130.20; or New York Penal Law 130.35; or New York Penal Law 130.50; or New York Penal Law 130.52; or New York Penal Law 130.66; or any violation of 18 U.S.C. §1591 - §1595.

20.     At all times material to this cause of action, Jeffrey Epstein was an adult male over 45 years old.  Epstein was a tremendously wealthy individual, widely recognized as a billionaire, who used his wealth, power, resources, and connections to commit illegal sexual crimes in violation of federal and state laws and who

employed or conspired with other individuals and corporate entities to assist him in committing those crimes or torts or who facilitated or enabled those acts to occur.

21.     Epstein displayed his enormous wealth, power, and influence to his employees; to the employees of the corporate Defendants or company entities who worked at his direction; to the victims procured for sexual purposes; and to the public, in order to advance, carry out and conceal his crimes and torts.

22.     At all relevant times, Epstein had access to numerous mansions, as well as a fleet of airplanes, motor vehicles, boats and one or more helicopters.  For example, he regularly traveled by private jet aboard a Boeing aircraft (of make and model B-727-31H with tail number N908JE) or a Gulfstream aircraft (of make and model G-1159B with tail number N909JE).  Corporate Defendant NES employed and paid the pilots who knowingly transported Plaintiff and other young females in furtherance of the sex trafficking operation delineated herein.

23.     Jeffrey Epstein also frequently inhabited and travelled between numerous properties and homes, each of which he admitted to being owned or controlled by him, including a Manhattan townhome located at 9 East 71st Street, New York, NY 10021 valued conservatively by Jeffrey Epstein's own admission at $55,931,000.00; a ranch located at 49 Zorro Ranch Road, Stanley, New Mexico 87056 valued conservatively by Jeffrey Epstein's own admission at $17,246,208.00; a home located at 358 El Brillo Way, Palm Beach, Florida 33480 valued

conservatively by Jeffrey Epstein's own admission at $12,380,209.00; an apartment located at 22 Avenue Foch, Paris, France 75116 valued conservatively by Jeffrey Epstein's own admission at $8,672,820.00; an Island located at Great St. James Island No. 6A USVI 00802 (parcels A, B, C); and an Island Little St. James Island No. 6B USVI 00802 (A, B, C).  *See* Jeffrey Epstein "Asset Summary – June 30, 2019" filed in Case 1:19-cr-00490-RMB on July 15, 2019.

24.     Jeffrey Epstein controlled or was otherwise affiliated with the corporation or business entities that owned, managed, or maintained each of the real properties listed in the preceding paragraph.

25.     The allegations herein concern Jeffrey Epstein's tortious conduct committed against Plaintiff; while at the residence owned by Nine East and then Maple; or the residence located in the United States Virgin Islands owned by LSJ; or the residence located in Palm Beach, Florida.  Many such acts were facilitated by Defendant NES, Defendant HBRK, Defendant Florida Science, or Defendant Financial Trust.

26.     Epstein had a compulsive sexual preference for young females, as young as 14 years old, and acted on that sexual preference for decades.

27.     Epstein enjoyed sexual contact with young females, including minor children, and also took pleasure corrupting vulnerable and innocent young females, including minor children, into engaging in sexual acts with him.

28.     Epstein directed a complex system of individuals, including employees and associates of Defendant entities, to work in concert and at his direction, for the purpose of harming young females through sexual exploitation, abuse and trafficking.

29.     Epstein's conduct of engaging in regular sexual activity with young females, including minors, was known to Corporate Defendants, who were employed by Epstein or worked at his direction for the exclusive purpose of assisting Epstein in engaging in these known sexual activities, enabling the activities through payment to victims, scheduling victims to be in Epstein's presence, or arranging for transportation of the victims.

30.     It was widely known among individuals regularly in Epstein's presence that he obtained pleasure from corrupting and inducing vulnerable young females into engaging in uncomfortable and unwanted sexual acts for his own gratification.

31.     Epstein's illegal sexual activities were investigated by law enforcement on at least two occasions, once in 2005-2008 by the United States Attorney for the Southern District of Florida, and more recently by the United States Attorney for the Southern District of New York.

32.     On July 2, 2019, the United States Attorney's Office for the Southern District of New York filed a Sealed Two Count Indictment including One Count of Sex Trafficking Conspiracy and One Count of Sex Trafficking for violations of 18

U.S.C. §1591, in part due to Epstein's criminal activities against children in the New York Mansion located at 9 East 71st Street.

33.     On July 8, 2019, Jeffrey Epstein was arrested pursuant to the aforementioned Indictment.

34.     The Indictment stated in part, and Plaintiff herein adopts as true and relevant to her Complaint, that "Jeffrey Epstein, the defendant, enticed and recruited, and caused to be enticed and recruited, minor girls to visit his mansion in Manhattan, New York (the "New York Residence") and his estate in Palm Beach, Florida (the "Palm Beach Residence") to engage in sex acts with him, after which the victims were given hundreds of dollars in cash."  Criminal Indictment at 1.

35.     "Moreover, and in order to maintain and increase his supply of victims, Epstein also paid certain of his victims to recruit additional girls to be similarly abused by EPSTEIN.  In this way, EPSTEIN created a vast network of underage victims for him to sexually exploit in locations including New York and Palm Beach."  Criminal Indictment at 1-2.

36.     "The victims described herein were as young as 14 years old at the time they were abused by Jeffrey Epstein, and were, for various reasons, often particularly vulnerable to exploitation.  Epstein intentionally sought out minors and knew that many of his victims were in fact under the age of 18, including because, in some instances, minor victims expressly told him their age."  Criminal Indictment at 2.

37.     "In creating and maintaining this network of minor victims in multiple states to sexually abuse and exploit, JEFFREY EPSTEIN … worked and conspired with others, including employees and associates who facilitated his conduct by, among other things, contacting victims and scheduling their sexual encounters with EPSTEIN at the New York Residence and at the Palm Beach Residence."  Criminal Indictment at 2.

38.     The indictment further explained, and Plaintiff adopts and alleges, that, "[v]ictims were initially recruited to provide 'massages' to Epstein, which would be performed nude or partially nude, would become increasingly sexual in nature, and would typically include one or more sex acts."  Criminal Indictment at 3.

39.     "Epstein abused numerous minor victims at the New York Residence by causing these victims to be recruited to engage in paid sex acts with him."  Criminal Indictment at 3.

40.     Plaintiff was interviewed as part of the 2019 criminal sex trafficking case against Jeffrey Epstein.

41.     In addition to the allegations in the criminal indictment referenced above, Epstein also utilized a similar, if not the same, scheme many years before the time period that was charged and many years after, as well as in additional locations nationally and internationally.

11

42.     Corporate Defendants enabled Jeffrey Epstein to receive daily massages from young females, often minors, who were not experienced in massage. Rather than receive regular body massages, Epstein was sexually abusing the young females, including Plaintiff, in violation of New York Penal Law Section 130, a fact known to the various Corporate Defendant employees who were in regular contact with Epstein.

43.     Jeffrey Epstein could not have committed the many illegal and improper sexual offenses against Plaintiff without assistance from Defendants NES, Financial Trust, HBRK, and Florida Science.

44.     Employees of each if the various named Corporate Defendant performed actions or failed to perform actions that further placed victims, including Plaintiff, in danger of being sexually abused by Epstein, and assisted in the concealment of his sexually abusive acts.

## **Defendant HBRK**

45.     Defendant HBRK purports to be a financial advisory firm servicing high net worth individuals in excess of one billion dollars.

46.     Employees of HBRK knew or should have known that Jeffrey Epstein was a serial sexual abuser of young girls. Those individuals played necessary roles in facilitating Epstein's sexual abuse to the point that much of it would have been impossible but for the services provided by Defendant HBRK.

47.     Defendant HBRK employed recruiters of young females, and further directed employees of Epstein's related companies to recruit young females.  In order to grow the enterprise and satisfy his insatiable sexual desire, Epstein and those working at his direction enabled victims themselves to elevate their status within the enterprise to that of a paid recruiter of other victims, an elevation only made possible through the assistance of Defendants.  HBRK paid these victims with elevated status to recruit other victims to be abused by Epstein.

48.     Recruiters were taught by Jeffrey Epstein or by employees of HBRK to inform targeted young female victims that Epstein possessed extraordinary wealth, power, resources, and influence; that he was a philanthropist who would help female victims advance their education, careers, and lives; and that she only needed to provide Epstein with body massages in order to avail herself of his nearly unlimited assistance and influence.

49.     Epstein, HBRK, and its employees fulfilled Epstein's compulsive need for sex with young females by preying on their personal, psychological, financial, and related vulnerabilities. Epstein and Defendants' tactics included promising the victims money, shelter, transportation, gifts, employment, admission into educational institutions, educational tuition, profession, licensure, protection, healthcare, and other things of value.

50.     Defendant HBRK employees were paid by Epstein strictly to perform functions to allow his sexual activity with young females, including Plaintiff, to continue.

51.     HBRK employees were expected and paid to maintain large amounts of cash at each of Epstein's properties including his mansion in New York, in order for Epstein to have money to pay the young females, including Plaintiff for sexual activities. HBRK employees were responsible for nearly all cash that was delivered to Epstein to pay his victims including Plaintiff.

52.     HBRK employees were tasked with obtaining, controlling, and distributing hush money to victims of Jeffrey Epstein. HBRK additionally stored large amounts of cash in its offices to ensure that there were funds available to pay and silence victims of Epstein at any given time.

53.     Defendant HBRK employees were expected and paid to maintain a list of names and phone numbers of young females, including Plaintiff, who had been to Jeffrey Epstein's homes, and those employees did perform that job function.

54.     Defendant HBRK employees were expected and paid to make telephone calls to young females, and take telephone calls from young females, including Plaintiff for the purpose of causing the young female to go to one of Jeffrey Epstein's properties, including his NY Mansion, for the purposes of engaging in sexual contact with Jeffrey Epstein. HBRK employees did perform this job function.

55.    Defendant HBRK employees were expected and paid to maintain a schedule for appointment times for young females, including Plaintiff to be at Jeffrey Epstein's property, including his NY Mansion, for the purpose of making sure the sexual encounter occurred at the exact time Jeffrey Epstein wanted it to occur. HBRK employees did perform that job function.

56.    HBRK employees were expected and paid to communicate with young females, including Plaintiff to arrange travel and lodging, in order to ensure that the young female including Plaintiff was in Jeffrey Epstein's presence for sexual encounters to occur with Jeffrey Epstein at the exact time he wanted.  HBRK employees did perform that job function.

57.    Furthermore, HBRK provided actual paychecks to certain individuals with knowledge of Jeffrey Epstein's sex trafficking operation, who were themselves victims of his operation for years, and who he needed to silence and maintain as his victims. These individuals were coaxed by HBRK employees to enter into marriages for the benefit of Jeffrey Epstein, they were forced to have their taxes completed by HBRK employees, they were forced to be affiliated with companies at the direction of HBRK employees without knowledge as to even the function of the company, and they were subjected to being placed on falsified legal documents by HBRK employees. HBRK employees made it impossible for these victims to escape from the sex trafficking operation. At times, HBRK even operated out of the apartments

located at 301 East 66th Street, where Epstein persuaded a number of his victims to reside under his control.

58.    HBRK employees were also involved in and paid for concealing the sexual encounters between Jeffrey Epstein and young females, including Plaintiff, in many ways, including hiring lawyers for young females; making payments to young females; labeling these young females as masseuses to attempt to describe the sexual encounter with a false and innocuous label; reminding, by email or other communication, how powerful and wealthy Jeffrey Epstein was in order to prevent the young female including Plaintiff from revealing the illegal nature of the sexual abuse in which Jeffrey Epstein was engaging with them; maintained damaging files on many of the young female victims that could be used against the female if she ever were to turn on Epstein or cooperate with law enforcement or in civil lawsuits against him or the organization; and causing young females to engage in acts she otherwise did not want to engage in such as marriages to other females.

**Defendant NES**

59.    Defendant NES employees were hired by Jeffrey Epstein strictly to perform functions to allow his sexual activity with young females, including minors, to occur and to continue.

60.     Defendant NES employees were compensated specifically to assist in the transportation of young females, including Plaintiff, to and from Jeffrey Epstein for sexual purposes both within the United States and over international waters.

61.     Defendant NES employees were expected and paid to communicate with young females, including Plaintiff, to arrange travel, in order to ensure that the young female was in Jeffrey Epstein's presence for sexual encounters to occur at the exact time he wanted.  NES employees did perform that job function.

62.     Defendant NES employees were expected transport females, including Plaintiff, by way of airplane or helicopter from one location to another location to be sexually abused by Jeffrey Epstein at one of his properties in New York, Florida, New Mexico, or the United States Virgin Islands, among other locations. NES employees did perform this job function.

63.     Defendant NES employees worked as private pilots responsible for and paid for trafficking young females, including Plaintiff, to be with Jeffrey Epstein for sexual purposes.  Plaintiff was forced to engage in abusive and illegal sexual acts with Jeffrey Epstein as a direct consequence of the actions of NES employees.

64.     Defendant NES employees were expected and paid to maintain a list of names of young females, including Plaintiff, who had been flown from one location to another on designated flight manifests. These flights took place in furtherance of

the sex trafficking operation at issue. Employees of NES did perform that job function.

65.     Defendant NES employees concealed the identity of certain female passengers in derogation of federal aviation law in furtherance of the sex trafficking operation at issue.

**Defendant FLORIDA SCIENCE FOUNDATION**

66.     Defendant FLORIDA SCIENCE FOUNDATION operated in Florida from at least 2008 through 2010 for the primary, if not exclusive, purpose of allowing Jeffrey Epstein to continue to engage in improper, illegal, and abusive sexual acts with young females while he was on work release during his Florida jail sentence or while on house arrest/community control from that jail sentence.

67.     Defendant FLORIDA SCIENCE maintained a physical office located at 250 Australian Avenue, Suite 1400, West Palm Beach, FL  33401.

68.     Defendant FLORIDA SCIENCE employees were young females who reported to the office location to perform job functions that included engaging in sexual activities with Jeffrey Epstein while he was on work release or house arrest.

69.     Plaintiff was flown to Florida to report to her "job" at the FLORIDA SCIENCE FOUNDATION under the guise of having a legitimate employment, only to find that FLORIDA SCIENCE was a cover whose function it was to facilitate

Jeffrey Epstein's sexual abuse of her inside the office, a fact known to Jeffrey Epstein and certain individuals employed by FLORIDA SCIENCE.

70.     Plaintiff was in fact forced to engage in sexual activity with Jeffrey Epstein while in the Florida Science Foundation office.

## Defendant FINANCIAL TRUST

71.     Defendant Financial Trust employees were compensated specifically to assist Jeffrey Epstein in obtaining young females, including minors, for sexual purposes, or for engaging in sex with young females, or scheduling appointments between these young females and Epstein for sexual purposes, or for engaging in acts to conceal the sexual activities between Epstein and these young females which included paying the young females for the sexual encounter or making promises to the young females to keep them quiet.

72.     Defendant Financial Trust employees were hired by Epstein strictly to perform functions to allow his sexual activity with young females, including minors, to continue.

73.     Financial Trust employees were expected and paid to maintain large amounts of cash at each of Epstein's properties including his mansion in New York, in order for Epstein to have money to pay the young females, including Plaintiff for sexual activities.  Financial Trust employees did perform this function.

74.     Defendant Financial Trust employees were expected and paid to maintain a list of names and phone numbers of young females, including Plaintiff, who had been to Jeffrey Epstein's homes, and those employees did perform that job function.

75.     Defendant Financial Trust employees were expected and paid to make telephone calls to young females, and take telephone calls from young females, including Plaintiff for the purpose of causing the young female to go to one of Jeffrey Epstein's properties, including his NY Mansion, for the purposes of engaging in sexual contact with Jeffrey Epstein. Financial Trust employees did perform this job function.

76.     Defendant Financial Trust employees were expected and paid to maintain a schedule for appointment times for young females, including Plaintiff to be at Jeffrey Epstein's property, including his NY Mansion, for the purpose of making sure the sexual encounter occurred at the exact time Jeffrey Epstein wanted it to occur.  Financial Trust employees did perform that job function.

77.     Financial Trust employees were expected and paid to communicate with young females, including Plaintiff to arrange travel and lodging, in order to ensure that the young female including Plaintiff was in Jeffrey Epstein's presence for sexual encounters to occur with Jeffrey Epstein at the exact time he wanted. Financial Trust employees did perform that job function.

78.     Financial Trust employees were also involved in and paid for concealing the sexual encounters between Jeffrey Epstein and young females, including Plaintiff, in many ways, including hiring lawyers for young females; making payments to young females; labeling these young females as masseuses to attempt to describe the sexual encounter with a false and innocuous label; reminding, by email or other communication, how powerful and wealthy Jeffrey Epstein was in order to prevent the young female including Plaintiff from revealing the illegal nature of the sexual abuse in which Jeffrey Epstein was engaging with them; maintained damaging files on many of the young female victims that could be used against the female if she ever were to turn on Epstein or cooperate with law enforcement or in civil lawsuits against him or the organization; and causing young females to engage in acts she otherwise did not want to engage in such as marriages to other females.

## ALL CORPORATE DEFENDANTS

79.     Jeffrey Epstein's sexual attraction to young, often underage, females dated back to at least the mid-nineties and the number of victims increased substantially with the necessary assistance from Defendants and Defendants' employees.

80.     Defendants, at the direction of Epstein or in furtherance of his demands, and with help from assistants, associates and underlings, and even other victims,

recruited or procured dozens if not hundreds of young females, including minors, for the purpose of Epstein's sexual gratification.

81.     Jeffrey Epstein, and employees of certain Corporate Defendants, including at least Defendants HBRK, Financial Trust, NES, and Florida Science Foundation specifically targeted underprivileged, emotionally vulnerable and/or economically disadvantaged young females to sexually molest and abuse.

82.     Additionally, Jeffrey Epstein and Corporate Defendants, through employees, informed young females, including Plaintiff, that Jeffrey Epstein was wealthy, well-connected, and had the power and ability to impact the life, in both good and bad ways, of any young female recruited or obtained to provide a massage.

83.     Multiple associates, employees, and corporate entities assisted Defendants in causing Plaintiff to engage in commercial sex acts knowing fraud, coercion, threat of force, and means of force would be used to cause her to continue to engage in such acts.

84.     This assistance included making promises to Plaintiff, scheduling medical appointments or promising to schedule medical appointments, promising medical care to Plaintiff's close relative, and otherwise making representations about Epstein's ability to secure medical treatment for Plaintiff's relative all while knowing that these representations were false and fraudulent and designed to entice and induce Plaintiff to commit commercial sex acts for Jeffrey Epstein.

85.     In order to cause Plaintiff to engage in each commercial sex act, Epstein and his co-conspirators, associates, employees and related corporate entities, including Corporate Defendants, used coercion and duress, and knew that coercion and duress would be used, in order to cause Plaintiff to engage in such acts.

86.     Epstein and various associates, employees, and related corporations and employees, including Corporate Defendants, worked in concert together as an enterprise with extraordinary power, wealth, and resources capable of affecting Plaintiff's life in positive or negative ways depending on her level of cooperation, all while knowingly conveying these promises and threats to Plaintiff.

87.     Epstein and others associated with Epstein, including employees of Defendants, bragged about Epstein's unusual political and powerful connections and his ability to obtain education, housing, or medical needs for young females who cooperated with Epstein's sexual demands.

88.     Under Epstein's control were numerous companies with many employees and obvious resources, each of whom worked for the Epstein enterprise. While the individuals were employees of various Epstein related companies, including Defendant Corporations, it was clear to Plaintiff through explicit words, actions and appearances that all such employees acted at Epstein's direction and for his protection.   This team of individuals included chefs, butlers, receptionists,

schedulers, secretaries, flight attendants, pilots, housekeepers, maids, sex recruiters, drivers and other staff members.

89.     Each of the employees and associates were paid through companies believed to have been funded by Jeffrey Epstein and, regardless of such funding, were disciples of Jeffrey Epstein, constantly informing Plaintiff and other victims of Jeffrey Epstein's power and ability to improve or destroy a victim's life depending on her level of cooperation.

90.     The main and in many instances only function of each of the associates and employees of Corporate Defendants who acted at the instruction or direction of Epstein was to recruit, entice, harbor, transport, provide, obtain, maintain, or solicit young females, knowing that fraud or coercion would be used to cause each female, including Plaintiff, to engage in a commercial sex act.

91.     Each such associate described above was also employed and paid to perform functions in order to avoid detection of the illegality of Epstein's commercial sex trafficking and to forever conceal the enterprise.

92.     One significant element of the sex trafficking scheme—a scheme used to compel commercial sex acts of young females, including Plaintiff—was its design and effort to avoid detection.  This concealment was furthered by the enterprise's design, actions, and patterns of behavior which caused Plaintiff and others similarly

situated to believe that failure to perform acts required by the scheme would result in serious psychological, financial, or reputational harm.

93.     The scheme included frequent statements to Plaintiff and other victims by Jeffrey Epstein and his associates, including employees of Corporate Defendants, that: (1) Jeffery Epstein was of extraordinary wealth, power and influence; (2) Jeffrey Epstein's business and political friends, including world leaders, included some of the most powerful people in the world; (3) the scheme or plan was designed to constantly grow the number of victims through the recruitment of other victims; (4) Jeffrey Epstein had the ability to advance or destroy nearly anyone financially, reputationally, or otherwise; (5) medical and normal life necessities would be denied victims if they, including Plaintiff, failed to perform commercial sex acts for Epstein; and (6) Epstein could take away Plaintiff's and other victims' life needs such as shelter or housing if she or they failed to perform those acts.

94.     Each of the Corporate Defendants committed acts of negligence that allowed for Epstein to commit acts in violation of New York Penal Law section 130.

95.     Each of the Defendants committed acts against Plaintiff in violation of 18 U.S.C. §1591 - §1595.

## PRISCILLA DOE

96.     Plaintiff was twenty years old and living with her mother when she met Jeffrey Epstein in 2006.  Jeffrey Epstein was under federal criminal investigation by

the United States Attorney for the Southern District of Florida in relation to his commission of various federal crimes, including violations of 18 U.S.C. §1591, against more than 30 identified minor females at the time he met Plaintiff.

97.     Plaintiff was a ballet dancer in New York, who worked menial jobs to pay for training at Step on Broadway and the Joffrey Ballet, and who was about to begin rehearsal for The Nutcracker with the Eglevsky Ballet School, when she was recruited to meet Jeffrey Epstein by another young female who had also fallen prey to Jeffrey Epstein's sex trafficking scheme.

98.     The recruiter asked Plaintiff if she wanted a job giving massages to a very wealthy man.

99.     Plaintiff agreed to meet Jeffrey Epstein, knowing that she would be going to a New York mansion to give a wealthy man a massage.

100.     The first time to the Mansion at 9 East 71st Street, she was taken upstairs and Jeffrey Epstein paid her hundreds of dollars to give him a massage. This massage was not sexual and Jeffrey Epstein used the time to ask Plaintiff about her life, during which he learned that Plaintiff was a virgin, she was economically very poor, she loved and wanted to financially support her mother, and she was very religious and consequently would not have sex before marriage.

101.     Jeffrey Epstein paid Plaintiff for the massage, took her number and told her someone would call her to return.

102.    Associate 1 called Plaintiff and told her to come back for a second time.

103.    Again, on a second visit, Plaintiff was taken to the massage room in the Mansion and Jeffrey Epstein spent much of the time asking questions about Plaintiff, learning what she cared about, what professional plans she had, and what problems she was experiencing. Epstein's questions were targeted to learn information he could use to exploit Plaintiff.

104.    By the third visit, in 2006, Jeffrey Epstein informed Plaintiff that he had resources that he would use to advance Plaintiff's dance career if she would do what he wanted her to do.

105.    Plaintiff started visiting Jeffrey Epstein more regularly and he began making the massages more sexual, digitally penetrating Plaintiff, and using sexual objects to insert in Plaintiff.

106.    Jeffrey Epstein always reminded Plaintiff that because of the money he was paying her for the commercial sex acts that he called "massage," she was able, for the first time, to pay for her mother's rent and for her own groceries.

107.    During her conversations with Jeffrey Epstein, Plaintiff repeatedly reminded him that she was a virgin, and that her religion would not allow her to have sexual intercourse before marriage.

108.    Despite the fact that he had assured Plaintiff he would not try to have sexual intercourse with her, Jeffrey Epstein forced himself on Plaintiff and took her virginity against her will and wishes.

109.    In 2006, Jeffrey Epstein told Plaintiff she was going on a trip with him to his island in the United States Virgin Islands.

110.    On that trip was Jeffrey Epstein, Jean Luc Brunel, Ghislaine Maxwell, Associate 2, Associate 8, and two other victims in addition to Plaintiff.

111.    Plaintiff's passport was confiscated upon arrival at Epstein's Island.

112.    It was there that Ghislaine Maxwell trained Plaintiff the "proper way to give a blow job," describing to her the exact way that Jeffrey Epstein liked to be sexually serviced orally.

113.    Ghislaine Maxwell explicitly told Plaintiff she needed to learn how to properly sexually service Jeffrey Epstein in the exact way that he preferred.

114.    Ghislaine Maxwell then directed Plaintiff step by step, using her own hands to demonstrate, how to pleasure Jeffrey Epstein manually so that Plaintiff would know exactly how to make Jeffrey Epstein happy.

115.    The instruction by Ghislaine Maxwell included training on the proper pressure to apply, the location in which pressure should be applied, the location of the various nerve endings that should be stimulated, and the areas of the penis that are the most sensitive for targeted stimulation.

116.    Ghislaine Maxwell made it clear to Plaintiff that it was very important for her to understand and take this instruction seriously.  The message delivered to Plaintiff by Ghislaine Maxwell was conveyed in a stern and menacing manner that instilled genuine fear in Plaintiff that her failure to comply would cause her serious harm.

117.    When Plaintiff was called in to "massage" Jeffrey Epstein on the Island after Ghislaine Maxwell's instruction, he reiterated the same instruction that Plaintiff was provided by Ghislaine Maxwell using a hands-on approach.

118.    In addition to providing sexual instruction, Ghislaine Maxwell further made sure that Plaintiff and the other young females were constantly on call to sexually service Jeffrey Epstein.

119.    While on the Island, Associate 2 also made it clear to Plaintiff that when Jeffrey Epstein asked her to engage in certain sexual behavior, she had to comply.

120.    Shortly thereafter, Jeffrey Epstein forced Plaintiff to engage in sexual activity with Associate 2 in his presence for his own sexual gratification.  The experience between Plaintiff and Associate 2 was especially painful and uncomfortable for Plaintiff.  Jeffrey Epstein directed Associate 2 to use force on Plaintiff even after Plaintiff complained that she was uncomfortable and did not want to participate in the sexual acts then underway.  At one point during the encounter, Jeffrey Epstein put his hands around Plaintiff's neck, which caused her a great deal

of fear and discomfort.  Jeffrey Epstein then masturbated and instructed Plaintiff to leave the room.

121.    Knowing that Jeffrey Epstein and his associates had confiscated her passport to prevent her from having the ability to leave the Island voluntarily, Plaintiff feared for her safety and felt forced into engaging in these sexual acts against her will.

122.    It was clear by this trip that Jeffrey Epstein was extremely powerful and could cause serious harm to Plaintiff if she disobeyed.

123.    Jeffrey Epstein learned in 2007 that Plaintiff's 17-year old relative had serious medical conditions and informed Plaintiff that he would use his resources to cure them.

124.    Plaintiff and Epstein talked numerous times about the fact that Plaintiff would only introduce him to her relative if he promised not to engage in any sexual conduct with her, to which Jeffrey Epstein agreed.

125.    Jeffrey Epstein repeatedly promised Plaintiff that he was going to help cure Plaintiff's relative's medical condition as a way to coerce and force Plaintiff to engage in commercial sex acts.

126.    Jeffrey Epstein controlled Plaintiff financially, emotionally and psychologically.   He used his knowledge of Plaintiff's aspirations, fears and

problems to manipulate her until she was completely controlled by and dependent on him.

127.    While Plaintiff was giving sexual massages, Jeffrey Epstein would always answer the phone if someone called.  Important Business Person 1, Important Business Person 2, Important Business Person 3, and Important Business Person 4 were regular callers and people with whom Jeffrey Epstein would have telephone calls during sexual massages.  Plaintiff does not want to reveal the identities of these individuals out of fear of retaliation.

128.    There were also times when Jeffrey Epstein, during sexual massages, would be on the verge of ejaculating and would stop in order to make a phone call, at times saying that nearing sexual climax evoked certain important thoughts in Jeffrey Epstein's mind.   Jeffrey Epstein would then take or initiate up to four business calls during any particular sexual massage.

129.    During these phone calls, Jeffrey Epstein would seem to be advising the individuals he called in a very stern, authoritative voice.

130.    On numerous calls, Plaintiff heard Jeffrey Epstein using a very angry and threatening tone and voice, making it known to the other party, and to Plaintiff, that he had the ability to cause serious harm to powerful people and anyone who did not cooperate with him.

131.    The reasonable impression that Plaintiff had from overhearing his phone calls and listening to what he told her was that Jeffrey Epstein controlled very powerful and influential people and that disobeying him would cause serious repercussions for the disobedient party.

132.    Plaintiff spent considerable time with Jeffrey Epstein and overheard many conversations.  In most, Jeffrey Epstein seemed to be advising other powerful individuals in a business context.  However, Important Business Person 1 was someone Jeffrey Epstein spoke to frequently, not only about business matters but also about what sounded to be intimate personal matters.  Based on the conversations she heard, and the manner and style of voice Epstein used, Plaintiff believed for many months that this person was a female.

133.     As Jeffrey Epstein realized Plaintiff's vulnerabilities, he began controlling her even more to a point where she felt she had no choice but to engage in commercial sex acts without putting herself in serious danger.

134.    Jeffrey Epstein would demand that Plaintiff massage him and to continue to massage him even if he fell asleep or he would become very angry.

135.    From 2006, when Jeffrey Epstein first forced himself on her and took her virginity, until 2012, he forced her to engage in commercial sex with him—sex for money—including intercourse, regularly and consistently.  At no time did he give her a choice about whether to engage in commercial sex. Epstein disregarded

her strenuous objections and perpetrated whatever sex acts he wanted against her will.

136.     During that time, Jeffrey Epstein controlled nearly every aspect of Plaintiff's life from the clothing and jewelry she was permitted to wear to the career path she was permitted to followed, to the food she was allowed to consume.

137.     When Jeffrey Epstein went to jail for sex offenses in Florida, he maintained contact with Plaintiff.   He and employees of Defendant HBRK, Defendant NES, Defendant Financial Trust and Defendant Florida Science caused Plaintiff to be transported to Florida in order to engage in commercial sex with Jeffrey Epstein in his Florida residence while on so-called "work release" from jail, while he was still wearing his ankle monitor.

138.     After Jeffrey Epstein was no longer in "jail" or on "work release" and came back to New York, Plaintiff attempted to discontinue seeing Jeffrey Epstein. This attempt angered Jeffrey Epstein.

139.     There came a time when Plaintiff, on her own, took a trip to Montreal and Jeffrey Epstein immediately knew that she was gone from New York and summoned her back to his New York Mansion.   He told her she was not permitted to leave New York without his permission and that she was required to remain in New York, on call to service his needs when told.

140.    This "disciplining" of Plaintiff in connection with her Montreal trip caused Plaintiff great fear that if she failed to engage in commercial sex on the terms and conditions set by Epstein, he or the Corporate Defendants would cause her serious harm.

141.    Jeffrey Epstein told Plaintiff to move into an apartment in a building he owned or controlled at 301 East 66 Street, which Plaintiff did.

142.    There it became obvious to her that she was under constant surveillance; that Jeffrey Epstein was able to monitor and know what she was doing in the apartment at all times, and that he was able to know and monitor where she was going outside the apartment.  Epstein intermittently "surprised" Plaintiff by showing up unexpectedly, causing Plaintiff to believe he was stalking her.

143.    Plaintiff, between 2006 and 2012, was trafficked to Jeffrey Epstein's Island on Little Saint James on more than twenty occasions.  On each occasion she was forced to engage in commercial sex.

144.    On one occasion on the Island, Plaintiff posted a publicly readable social media post indicating that she was on the island.  The next morning, Jeffrey Epstein woke her while holding her wrists tightly.  He was in a state of great anger. His laptop computer was open.  He began questioning her, stating, "Why did you make this post? Who has read it?  What have you told them?"   Jeffrey Epstein threatened Plaintiff and commanded her never to tell anyone about the commercial

sex acts in which he was making Plaintiff engage, and never to tell her mother of her activities with Jeffrey Epstein. As punishment for the post she had made, Jeffrey Epstein did not speak with Plaintiff for a month, causing her to fear that he would rescind his promise to help her family member and otherwise harm Plaintiff.

145.    Jeffrey Epstein sent Plaintiff back to New York without paying her for any of the commercial sex acts she had engaged in with him on the island on a daily basis over the course of approximately one week.

146.    Plaintiff, from that point forward in 2007, was in fear for her safety and her life and knew that strict compliance with the dictates of this very powerful man was required as a condition of her maintaining her safety and her life. Epstein, in a show of his anger and power, kicked Plaintiff out of her living quarters, essentially rendering her homeless overnight. At the same time, Epstein informed Plaintiff that she was forbidden to tell anyone about him or the sexual activities he was engaging in with her.

147.    In order to cause Plaintiff to continue to engage in commercial sexual activity, Jeffrey Epstein made it known that he was close friends with other powerful and influential people.

148.    Jeffrey Epstein commonly bragged to Plaintiff that Bill Clinton, Donald Trump, Prince Andrew, and the Sultan of Dubai were among his closest friends.

149.     Plaintiff overhead Jeffrey Epstein talking with the Sultan of Dubai and on one occasion met him in person, supporting Jeffrey Epstein's statements that he was closely associated with this and other powerful friends.

150.     Plaintiff observed photographs of Jeffrey Epstein and Bill Clinton together and heard Jeffrey Epstein talk about times when Clinton was on his private island in Little Saint James.  Plaintiff never saw Bill Clinton on the island.

151.     As Plaintiff was trying to distance herself from Jeffrey Epstein, he called her into his massage room and warned her not to lie to him or there would be serious repercussions.  He threatened her and caused her to fear for her safety in order to force and coerce her to continue to engage in commercial sex.  Epstein worked with the people and resources of his vast enterprise, including Corporate Defendants, to ensure that Plaintiff would comply.

152.     On one occasion, Jeffrey Epstein forced Plaintiff to serve hors d'oeuvres at Epstein's private party with Woody Allen.  This server's role was forced upon Plaintiff in order to demean her, frighten her, and impress upon her the need for her to conceal the commercial sex trafficking enterprise he was running.

153.     He further demeaned her by directing her to sit on a movie theater floor and massage his feet during a movie.

154.     Jeffrey Epstein constantly told Plaintiff that her opportunities were endless as long as she complied with his dictates but that he could and would harm her if she did not.

155.     There came a time when Jeffrey Epstein forced Plaintiff to give other powerful friends massages.   During some of these massages she was sexually abused, by force, against her will, by the friends whom she had been required to massage. At least one of these friends informed Plaintiff that he had Epstein's permission to do what he wanted to her.

156.     Plaintiff, trying desperately to leave the proximity and influence of Jeffrey Epstein, failed to show up for multiple appointments at his mansion. Associate 1 contacted Plaintiff on behalf of Epstein and told her that Jeffrey Epstein was very upset with Plaintiff's behavior. This warning caused Plaintiff to experience extreme fear and anxiety for her safety and her life.  This fear and anxiety ultimately had its intended effect and Plaintiff returned to Jefferey Epstein's mansion to continue to engage in commercial sex acts.

157.     Jeffrey Epstein informed Plaintiff repeatedly that her career opportunities were endless as long as she complied with his demands.

158.     Jeffrey Epstein instructed Plaintiff in 2011 that he was putting her through massage school and she had no choice but to attend.

159.    While she was in massage school, Jeffrey Epstein repeatedly asked Plaintiff to recruit other young females from the massage school and became angry and threatening when she refused to do so.

160.    Jeffrey Epstein forced Plaintiff to wear certain color panties, remove certain body piercings, and undergo surgery by Jeffrey Epstein's doctors to remove body moles, and have her hair cut and colored to his liking by a stylist he chose. Plaintiff complied with these demands with the understanding, conveyed to her by Epstein, that she had no other choice.

161.    From 2006 through 2012, Jeffrey Epstein and his associates and employees recruited, enticed, harbored, transported, provided, obtained, maintained, and solicited Plaintiff knowing that force, threat of force, fraud or coercion would be used to compel Plaintiff to engage in commercial sex acts.

162.    The commercial sex acts included intercourse, the use of sex toys inserted inside Plaintiff, digital penetration, forcible touching and many other sexual acts.

163.    Plaintiff was made to engage in commercial sex acts in New York every year from 2006 to 2012 (except for a brief period of time in late 2008 through 2009 during which time Jeffrey Epstein was technically in jail in Florida); in the United States Virgin Islands from 2006 to 2012 (except, again, during a brief period of time during which Jeffrey Epstein was technically in jail in Florida); in Florida from 2007

to 2012 (including, as noted, sexual activity while Jeffrey Epstein wore his ankle bracelet); and in in New Mexico between 2007 and 2010.

164.     There were additional sexual acts to those described above which are too graphic and perverted to detail in the complaint.  Each and all of such acts were required by Jeffrey Epstein and his Corporate Defendants, all of whom worked together to cause Plaintiff to engage in such acts, including Defendants' informing her that if she refused to engage in such acts she would suffer serious harm.

165.     In order to maintain Plaintiff's compliance, Defendant Jeffrey Epstein also informed Plaintiff that he would use his vast resources to get Plaintiff's relative the serious medical care she needed, further enticing Plaintiff through fraud to engage in commercial sex acts.

166.     In addition to being explicitly reminded by Epstein, or one of his associates or employees of Corporate Defendants, of his extraordinary power to reward and punish Plaintiff, his power to do so was apparent to Plaintiff, inasmuch as: (1) she visited Epstein many times at his New York mansion, located at 9 East 71 Street, New York, New York, where she knew that Jeffrey Epstein lived when in New York (The mansion was owned by Nine East 71st Street, Corporation, from 1989 to 2011 until it was deeded to Maple, Inc., on December 23, 2011, the entity that maintains lawful possession today); (2) she flew on the Boeing 747 jet owned by JEGE, Inc., and controlled by Jeffrey Epstein and related companies; (3) she

visited his Florida Mansion located at 358 Brillo Way, Palm Beach, Florida owned by Jeffrey E. Epstein from 1990 through December 23, 2011; and (4) she visited his private Island in the United States Virgin Islands, located at No. 6B Red Hook Quarter, U.S. Virgin Islands, previously owned by Defendant L.S.J., LLC prior to its having been deeded to Nautilus, Inc., a United States Virgin Islands corporation, on December 23, 2011.

167.    Jeffrey Epstein bragged about knowing some of the world's most powerful people; introduced some of them to Plaintiff; and required Plaintiff to perform sexual massages on some of them.  These circumstances caused Plaintiff to believe that Jeffrey Epstein and his organization was powerful enough to cause her serious harm if she did not strictly follow his and their demands.

## COUNT I
## BATTERY AGAINST DARREN K. INDYKE AND RICHARD D. KAHN AS CO-EXECUTORS OF THE ESTATE OF JEFFREY E. EPSTEIN

168.    The Plaintiff adopts and realleges paragraphs 1 through 167 above.

169.    Jeffrey Epstein committed a harmful or offensive touching against Plaintiff when he intentionally touched the intimate parts of her body in an offensive manner without her consent.

170.    A criminal action against Epstein with respect to the same sex trafficking enterprise from which Plaintiff's first cause of action arises was

terminated on August 29, 2019, less than one year prior to the filing of this Complaint. *See* N.Y. C.P.L.R. § 215(8)(a).

171.     As a direct and proximate result of Jeffrey Epstein's battery, the Plaintiff has in the past suffered and in the future will continue to suffer physical injury, pain, emotional distress, psychological trauma, mental anguish, humiliation, embarrassment, loss of self-esteem, loss of dignity, invasion of her privacy and a loss of her capacity to enjoy life, as well as other damages.  Plaintiff incurred medical and psychological expenses and Plaintiff will in the future suffer additional medical and psychological expenses.  These injuries are permanent in nature and Plaintiff will continue to suffer these losses in the future.

WHEREFORE, Plaintiff demands judgment against the Estate of Jeffrey E. Epstein for compensatory and general damages, attorneys fees, and such other and further relief as this Court deems just and proper.  Plaintiff hereby demands trial by jury on all issues triable as of right by a jury.

### COUNT II
### BATTERY/VIOLATION OF SECTION 130
### AGAINST DARREN K. INDYKE AND RICHARD D. KAHN AS CO-EXECUTORS OF THE ESTATE OF JEFFREY E. EPSTEIN

172.     The Plaintiff adopts and realleges paragraphs 1 through 167 above.

173.     The intentional acts of Jeffrey Epstein against Plaintiff constitute a sexual offense as defined in New York Penal Law § 130, including but not limited to the following:

a. Sexual misconduct as defined in §130.20 inasmuch as Jeffrey Epstein engaged in sexual intercourse with Plaintiff without Plaintiff's consent;

b. Rape in the first degree as defined in §130.35 inasmuch as Jeffrey Epstein engaged in sexual intercourse with Plaintiff by forcible compulsion;

c. Criminal sexual act in the first degree as defined in §130.50 inasmuch as Jeffrey Epstein engaged in oral sexual conduct with Plaintiff by forcible compulsion;

d. Forcible touching as defined in §130.52 inasmuch as Jeffrey Epstein, intentionally and for no legitimate purpose, engaged the forcible sexual touching of Plaintiff for the purpose of degrading or abusing her or for the purpose of gratifying his own sexual desire; and

e. Sexual abuse in the third degree as defined in §130.66 inasmuch as Jeffrey Epstein inserted a foreign object in the vagina of Plaintiff by forcible compulsion.

174.    New York Penal Law § 213-C provides a twenty year statute of limitations to bring a claim against any party whose intentional or negligent acts or omissions are alleged to have resulted in the commission of a number of offenses delineated herein.

175.    As a direct and proximate result of Jeffrey Epstein's violation of New York Penal Law § 130, the Plaintiff has in the past suffered and in the future will continue to suffer physical injury, pain, emotional distress, psychological trauma, mental anguish, humiliation, embarrassment, loss of self-esteem, loss of dignity, invasion of her privacy and a loss of her capacity to enjoy life, as well as other damages.  Plaintiff incurred medical and psychological expenses and Plaintiff will

in the future suffer additional medical and psychological expenses.  These injuries are permanent in nature and Plaintiff will continue to suffer these losses in the future.

WHEREFORE, Plaintiff demands judgment against the Estate of Jeffrey E. Epstein for compensatory and general damages, attorneys fees, and such other and further relief as this Court deems just and proper.  Plaintiff hereby demands trial by jury on all issues triable as of right by a jury.

## COUNT III
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS AGAINST DARREN K. INDYKE AND RICHARD D. KAHN AS CO-EXECUTORS OF THE ESTATE OF JEFFREY E. EPSTEIN

176.     Plaintiff adopts and realleges paragraphs 1 through 167 above.

177.     As a direct result of the sexual violations of Plaintiff, Jeffrey Epstein committed intentional infliction of emotional distress against Plaintiff.

178.     Epstein's actions in sexually trafficking and assaulting Plaintiff constitute extreme and outrageous conduct that shocks the conscience. Epstein's sex trafficking scheme and abuse go beyond all possible bounds of decency and is intolerable in a civilized society.

179.     Epstein knew or disregarded the substantial likelihood that these actions would cause Plaintiff severe emotional distress.

180.     A criminal action against Epstein with respect to the same sex trafficking enterprise from which Plaintiff's first cause of action arises was

terminated on August 29, 2019, less than one year prior to the filing of this Complaint. *See* N.Y. C.P.L.R. § 215(8)(a).

181.    As a direct and proximate result of Jeffrey Epstein's battery, the Plaintiff has in the past suffered and in the future will continue to suffer physical injury, pain, emotional distress, psychological trauma, mental anguish, humiliation, embarrassment, loss of self-esteem, loss of dignity, invasion of her privacy and a loss of her capacity to enjoy life, as well as other damages.  Plaintiff incurred medical and psychological expenses and Plaintiff will in the future suffer additional medical and psychological expenses.  These injuries are permanent in nature and Plaintiff will continue to suffer these losses in the future.

WHEREFORE, Plaintiff demands judgment against the Estate of Jeffrey E. Epstein for compensatory and general damages, attorneys fees, and such other and further relief as this Court deems just and proper.  Plaintiff hereby demands trial by jury on all issues triable as of right by a jury.

### COUNT IV
### CAUSE OF ACTION AGAINST DARREN K. INDYKE AND RICHARD D. KAHN AS CO-EXECUTORS OF THE ESTATE OF JEFFREY E. EPSTEIN PURSUANT TO 18 U.S.C. § 1595

182.    Plaintiff adopts and realleges paragraphs 1 through 167 above.

183.    Jeffrey Epstein, within the special maritime and territorial jurisdiction of the United States, in interstate and foreign commerce, and/or affecting interstate and foreign commerce, knowingly recruited, enticed, harbored, transported,

provided, obtained, maintained, patronized, solicited, threatened, forced, or coerced Plaintiff to engage in commercial sex acts.

184.    Such actions were undertaken knowing that his use of force, threats of force, fraud, coercion, and/or combinations of such means would be used, and were in fact used, in order to cause Plaintiff to engage in commercial sex acts.  In doing so, Jeffrey Epstein violated 18 U.S.C. §1591.

185.    Furthermore, Jeffrey Epstein attempted to violate 18 U.S.C. §1591.  In so doing, violated 18 U.S.C. §1594(a).

186.    Jeffrey Epstein conspired with each member of the enterprise, and with other persons known and unknown, to violate 18 U.S.C. §1591.  In so doing, violated 18 U.S.C. §1594(c).

187.    Additionally, Defendants conspired with each other, and with other persons known and unknown, to violate 18 U.S.C. § 1592.  In so doing, Defendants violated 18 U.S.C. § 1594(b).

188.    By virtue of Jeffrey Epstein's violations of 18 U.S.C. §§ 1591, 1592, 1593A, and 1594, Defendant Darren K. Indyke and Richard D. Kahn as Joint Personal Representatives of the Estate of Jeffrey E. Epstein is subject to civil causes of action under 18 U.S.C. § 1595 by Plaintiff, who is a victim of the violations.

189.    Certain property of Epstein's was essential to the commission of the federal crimes and torts described herein, including the use of multiple private

aircraft including a Boeing aircraft (of make and model B-727-31H with tail number N908JE) and a Gulfstream aircraft (of make and model G-1159B with tail number N909JE). Such aircraft, along with other of Jeffrey Epstein's property, were used as means and instruments of Jeffrey Epstein's tortious and criminal offenses and, as such, are subject to forfeiture.

190.    Additionally, Jeffrey Epstein's New York mansion, located at 9 East 71st Street, New York, New York, in the Southern District of New York, and his private island located in the United States Virgin Islands, were used as means and instruments of Jeffrey Epstein's tortious and criminal offenses and, as such, are subject to forfeiture.

191.    As a direct and proximate result of Jeffrey Epstein's commission of the aforementioned criminal offenses enumerated in 18 U.S.C. § 1591, 1592, 1593A, and 1594, and the associated civil remedies provided in § 1595, Plaintiff has in the past suffered and will continue to suffer injury and pain; emotional distress; psychological and psychiatric trauma; mental anguish; humiliation; confusion; embarrassment; loss of self-esteem; loss of dignity; loss of enjoyment of life; invasion of privacy; and other damages associated with ' actions. Plaintiff will incur further medical and psychological expenses. These injuries are permanent in nature and Plaintiff will continue to suffer from them in the future. In addition to these losses, Plaintiff has incurred attorneys' fees and will be required do so in the future.

WHEREFORE, Plaintiff demands judgment against the Estate of Jeffrey E. Epstein for compensatory and general damages, attorney's fees, and such other and further relief as this Court deems just and proper.  Plaintiff hereby demands trial by jury on all issues triable as of right by a jury.

### COUNT V
### CAUSE OF ACTION AGAINST
### FINANCIAL TRUST COMPANY, INC.
### PURSUANT TO 18 U.S.C. § 1595

192.    Plaintiff adopts and realleges paragraphs 1 through 167 above.

193.    Defendant, by and through its management and personnel, within the special maritime and territorial jurisdiction of the United States, in interstate and foreign commerce, and/or affecting interstate and foreign commerce, knowingly recruited, enticed, harbored, transported, provided, obtained, maintained, patronized, solicited by any means Plaintiff.

194.    Defendant, by and through its management and personnel, knew that means of fraud or coercion, and/or combinations of such means, would be used, and were in fact used, in order to cause Plaintiff to engage in commercial sex acts.  In doing so, Defendant corporation violated 18 U.S.C. §1591.

195.    Defendant, by and through its management and personnel knowingly benefitted, financially and by receiving things of value, from participating in a venture (the Epstein sex trafficking venture enterprise) which had engaged in acts in

violation of 18 U.S.C. §1592 and 1595(a), knowing that the venture had engaged in such violations.  In so doing, Defendant corporation violated 18 U.S.C. §1593A.

196.    Furthermore, Defendant corporation attempted to violate 18 U.S.C. § 1591.  In so doing, violated 18 U.S.C. § 1594(a).

197.    Defendant, by and through its management and personnel, conspired with other members of the enterprise, and with other persons and companies, known and unknown, to violate 18 U.S.C. § 1591.  In so doing, Defendant violated 18 U.S.C. §1594(c).

198.    Additionally, Defendants conspired with each other, and with other persons known and unknown, to violate 18 U.S.C. §1592.  In so doing, Defendants violated 18 U.S.C. § 1594(b).

199.    By virtue of Jeffrey Epstein's violations of 18 U.S.C. §§1591, 1592, 1593A, and 1594, Defendant is subject to civil causes of action under 18 U.S.C. § 1595 by Plaintiff, who is a victim of the violations.

200.    Defendant, by and through its management and personnel, participated in a venture with Jeffrey Epstein's enterprise by knowingly recruiting, transporting, soliciting, obtaining, and maintaining Plaintiff knowing that fraud or coercion would be used to cause Plaintiff to commit a commercial sex act.

201.    As a direct and proximate result of Defendant corporation's commission of the aforementioned criminal offenses enumerated in 18 U.S.C. §

1591, 1592, 1593A, and 1594, and the associated civil remedies provided in § 1595, Plaintiff has in the past suffered and will continue to suffer injury and pain; emotional distress; psychological and psychiatric trauma; mental anguish; humiliation; confusion; embarrassment; loss of self-esteem; loss of dignity; loss of enjoyment of life; invasion of privacy;  and other damages associated with ' actions. Plaintiff will incur further medical and psychological expenses.  These injuries are permanent in nature and Plaintiff will continue to suffer from them in the future.  In addition to these losses, Plaintiff has incurred attorneys' fees and will be required do so in the future.

WHEREFORE, Plaintiff demands judgment against Defendant, Financial Trust Company, Inc., For compensatory and general damages, attorney's fees, and such other and further relief as this Court deems just and proper.  Plaintiff hereby demands trial by jury on all issues triable as of right by a jury.

### COUNT VI
### CAUSE OF ACTION AGAINST NES, LLC
### PURSUANT TO 18 U.S.C. § 1595

202.    Plaintiff adopts and realleges paragraphs 1 through 167 above.

203.    Defendant, by and through its management and personnel, within the special maritime and territorial jurisdiction of the United States, in interstate and foreign commerce, and/or affecting interstate and foreign commerce, knowingly

recruited, enticed, harbored, transported, provided, obtained, maintained, patronized, solicited by any means Plaintiff.

204.    Defendant, by and through its management and personnel, knew that means of fraud or coercion, and/or combinations of such means, would be used, and were in fact used, in order to cause Plaintiff to engage in commercial sex acts.  In doing so, Defendant corporation violated 18 U.S.C. §1591.

205.    Furthermore, Defendant corporation attempted to violate 18 U.S.C. § 1591.  In so doing, violated 18 U.S.C. § 1594(a).

206.    Defendant, by and through its management and personnel, conspired with other members of the enterprise, and with other persons and companies, known and unknown, to violate 18 U.S.C. § 1591.  In so doing, Defendant violated 18 U.S.C. § 1594(c).

207.    Additionally, Defendants conspired with each other, and with other persons known and unknown, to violate 18 U.S.C. § 1592.  In so doing, Defendants violated 18 U.S.C. § 1594(b).

208.    By virtue of Jeffrey Epstein's violations of 18 U.S.C. §§ 1591, 1592, 1593A, and 1594, Defendant is subject to civil causes of action under 18 U.S.C. § 1595 by Plaintiff, who is a victim of the violations.

209.    Defendant, by and through its management and personnel, participated in a venture with Jeffrey Epstein's enterprise by knowingly recruiting, transporting,

soliciting, obtaining, and maintaining Plaintiff knowing that fraud or coercion would be used to cause Plaintiff to commit a commercial sex act.

210.    As a direct and proximate result of Defendant corporation's commission of the aforementioned criminal offenses enumerated in 18 U.S.C. § 1591, 1592, 1593A, and 1594, and the associated civil remedies provided in § 1595, Plaintiff has in the past suffered and will continue to suffer injury and pain; emotional distress; psychological and psychiatric trauma; mental anguish; humiliation; confusion; embarrassment; loss of self-esteem; loss of dignity; loss of enjoyment of life; invasion of privacy;  and other damages associated with ' actions. Plaintiff will incur further medical and psychological expenses.  These injuries are permanent in nature and Plaintiff will continue to suffer from them in the future.  In addition to these losses, Plaintiff has incurred attorneys' fees and will be required do so in the future.

WHEREFORE, Plaintiff demands judgment against Defendant, NES, Inc., for compensatory and general damages, attorney's fees, and such other and further relief as this Court deems just and proper.  Plaintiff hereby demands trial by jury on all issues triable as of right by a jury.

**COUNT VII**
**CAUSE OF ACTION AGAINST**
**HBRK ASSOCIATES, INC. PURSUANT TO 18 U.S.C. § 1595**

211.    Plaintiff adopts and realleges paragraphs 1 through 167 above.

212.     Defendant, by and through its management and personnel, within the special maritime and territorial jurisdiction of the United States, in interstate and foreign commerce, and/or affecting interstate and foreign commerce, knowingly recruited, enticed, harbored, transported, provided, obtained, maintained, patronized, solicited by any means Plaintiff.

213.     Defendant, by and through its management and personnel, knew that means of fraud or coercion, and/or combinations of such means, would be used, and were in fact used, in order to cause Plaintiff to engage in commercial sex acts.  In doing so, Defendant corporation violated 18 U.S.C. §1591.

214.     Defendant, by and through its management and personnel knowingly benefitted, financially and by receiving things of value, from participating in a venture (the Epstein sex trafficking venture enterprise) which had engaged in acts in violation of 18 U.S.C. § 1592 and 1595(a), knowing that the venture had engaged in such violations.  In so doing, Defendant corporation violated 18 U.S.C. § 1593A.

215.     Furthermore, Defendant corporation attempted to violate 18 U.S.C. § 1591.  In so doing, violated 18 U.S.C. § 1594(a).

216.     Defendant, by and through its management and personnel, conspired with other members of the enterprise, and with other persons and companies, known and unknown, to violate 18 U.S.C. § 1591.  In so doing, Defendant violated 18 U.S.C. § 1594(c).

217.    Additionally, Defendants conspired with each other, and with other persons known and unknown, to violate 18 U.S.C. § 1592.  In so doing, Defendants violated 18 U.S.C. § 1594(b).

218.    By virtue of Jeffrey Epstein's violations of 18 U.S.C. §§ 1591, 1592, 1593A, and 1594, Defendant is subject to civil causes of action under 18 U.S.C. § 1595 by Plaintiff, who is a victim of the violations.

219.    Defendant, by and through its management and personnel, participated in a venture with Jeffrey Epstein's enterprise by knowingly recruiting, transporting, soliciting, obtaining, and maintaining Plaintiff knowing that fraud or coercion would be used to cause Plaintiff to commit a commercial sex act.

220.    As a direct and proximate result of Defendant corporation's commission of the aforementioned criminal offenses enumerated in 18 U.S.C. § 1591, 1592, 1593A, and 1594, and the associated civil remedies provided in § 1595, Plaintiff has in the past suffered and will continue to suffer injury and pain; emotional distress; psychological and psychiatric trauma; mental anguish; humiliation; confusion; embarrassment; loss of self-esteem; loss of dignity; loss of enjoyment of life; invasion of privacy;  and other damages associated with ' actions. Plaintiff will incur further medical and psychological expenses.  These injuries are permanent in nature and Plaintiff will continue to suffer from them in the future.  In

addition to these losses, Plaintiff has incurred attorneys' fees and will be required do so in the future.

WHEREFORE, Plaintiff demands judgment against Defendant, HBRK Associates, Inc., for compensatory and general damages, attorney's fees, and such other and further relief as this Court deems just and proper.  Plaintiff hereby demands trial by jury on all issues triable as of right by a jury.

## COUNT VIII
## CAUSE OF ACTION AGAINST FLORIDA SCIENCE
## PURSUANT TO 18 U.S.C. § 1595

221.    Plaintiff adopts and realleges paragraphs 1 through 167 above.

222.    Defendant, by and through its management and personnel, within the special maritime and territorial jurisdiction of the United States, in interstate and foreign commerce, and/or affecting interstate and foreign commerce, knowingly recruited, enticed, harbored, transported, provided, obtained, maintained, patronized, solicited by any means Plaintiff.

223.    Defendant, by and through its management and personnel, knew that means of fraud or coercion, and/or combinations of such means, would be used, and were in fact used, in order to cause Plaintiff to engage in commercial sex acts.  In doing so, Defendant corporation violated 18 U.S.C. §1591.

224.    Defendant, by and through its management and personnel knowingly benefitted, financially and by receiving things of value, from participating in a

venture (the Epstein sex trafficking venture enterprise) which had engaged in acts in violation of 18 U.S.C. § 1592 and 1595(a), knowing that the venture had engaged in such violations.  In so doing, Defendant corporation violated 18 U.S.C. § 1593A.

225.    Furthermore, Defendant corporation attempted to violate 18 U.S.C. § 1591.  In so doing, violated 18 U.S.C. § 1594(a).

226.    Defendant, by and through its management and personnel, conspired with other members of the enterprise, and with other persons and companies, known and unknown, to violate 18 U.S.C. § 1591.  In so doing, Defendant violated 18 U.S.C. § 1594(c).

227.    Additionally, Defendants conspired with each other, and with other persons known and unknown, to violate 18 U.S.C. § 1592.  In so doing, Defendants violated 18 U.S.C. § 1594(b).

228.    By virtue of Jeffrey Epstein's violations of 18 U.S.C. §§ 1591, 1592, 1593A, and 1594, Defendant is subject to civil causes of action under 18 U.S.C. § 1595 by Plaintiff, who is a victim of the violations.

229.    Defendant, by and through its management and personnel, participated in a venture with Jeffrey Epstein's enterprise by knowingly recruiting, transporting, soliciting, obtaining, and maintaining Plaintiff knowing that fraud or coercion would be used to cause Plaintiff to commit a commercial sex act.

230.    As a direct and proximate result of Defendant corporation's commission of the aforementioned criminal offenses enumerated in 18 U.S.C. § 1591, 1592, 1593A, and 1594, and the associated civil remedies provided in § 1595, Plaintiff has in the past suffered and will continue to suffer injury and pain; emotional distress; psychological and psychiatric trauma; mental anguish; humiliation; confusion; embarrassment; loss of self-esteem; loss of dignity; loss of enjoyment of life; invasion of privacy;  and other damages associated with ' actions. Plaintiff will incur further medical and psychological expenses.  These injuries are permanent in nature and Plaintiff will continue to suffer from them in the future.  In addition to these losses, Plaintiff has incurred attorneys' fees and will be required do so in the future.

WHEREFORE, Plaintiff demands judgment against Defendant, FLORIDA SCIENCE, for compensatory and general damages, attorney's fees, and such other and further relief as this Court deems just and proper.  Plaintiff hereby demands trial by jury on all issues triable as of right by a jury.

Dated:  June 9, 2021.

Respectfully Submitted,
EDWARDS POTTINGER, LLC

By:  */s/ Bradley Edwards*
     Bradley J. Edwards
     Brittany N. Henderson
     425 N. Andrews Ave., Suite 2
     Fort Lauderdale, FL 33301

(954)-524-2820
Fax: (954)-524-2822
Email: brad@epllc.com
        brittany@epllc.com

## CERTIFICATE OF SERVICE

I hereby certify that on June 9, 2021, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

*/s/ Bradley Edwards*